**Frier & Levitt, LLC**
**Attorneys at Law**
Jonathan E. Levitt, Esq.
Jason N. Silberberg, Esq. (*Pro Hac Vice* application to be filed)
Matthew J. Modafferi, Esq. (*Pro Hac Vice* application to be filed)
jlevitt@frierlevitt.com
jsilberberg@frierlevitt.com
mmodafferi@frierlevitt.com
*Attorneys for Plaintiff Community Oncology Alliance*

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMUNITY ONCOLOGY ALLIANCE, | Civil Action No.: |
| Plaintiff, | |
| | Hon. _____ U.S.D.J. |
| -against- | Hon. _____ U.S.M.J. |
| XAVIER BECERRA, Secretary of U.S. Department of Health and Human Services, | **VERIFIED COMPLAINT** |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| CHIQUITA BROOKS-LASURE, Administrator of the Centers for Medicare and Medicaid Services, | |
| CENTERS FOR MEDICARE AND MEDICAID SERVICES, | |
| Defendants. | |

Plaintiff, Community Oncology Alliance ("COA" or "Plaintiff"), individually and on behalf of its organizational members comprised of community oncology practices throughout the United States, by and through its undersigned counsel, hereby make the following allegations against Defendants, Xavier Becerra ("Becerra") as Secretary of the United States Department of Health and Human Services; the United States Department of Health and Human Services ("HHS"), Chiquita Brooks-LaSure ("Brooks-LaSure") as Administrator of the Centers for Medicare and Medicaid Services; and the Centers for Medicare and Medicaid Services ("CMS") (collectively, "Defendants"):

## PRELIMINARY STATEMENT

### A. *Introduction*

1.        In a dangerous display of agency overreach, Defendants issued an unlawful rule, disguised as a mere "frequently asked question" nonchalantly posted on their website (the "FAQ"),[1] that removed a crucial and lifesaving tool from the practice of oncology for Medicare- and Medicaid-enrollee-patients throughout the United States – the ability to furnish in-office dispensed medications to patients via delivery. Previously, and consistent with lawfully promulgated regulations under the so-called Stark law, oncologists could and did use this tool to furnish lifesaving (in the most literal sense of the word) medications, such as oral oncolytics and attendant supportive therapies, to their cancer patients via delivery. This allowed oncologists to directly, accurately and in real-time monitor patient adherence to critical medication regimens, and modify those regimens as may be clinically appropriate. As a result of the FAQ, oncologists who attempt to furnish life-extending drugs to patients enrolled in Medicare (or other federally-funded programs such as TRICARE) by delivery may run afoul of the Stark law, which could potentially subject them to devastating civil and even criminal penalties. In other words, the FAQ has, in one fell swoop, placed a nationwide and indefinite freeze on the furnishing of cancer medications dispensed by physicians (or physician-owned pharmacies) to their patients via delivery, causing substantial and irreparable harm to oncologists and their patients alike. At bottom, therefore, Plaintiff brings this action to save the lives of Medicare beneficiaries suffering

---

[1]    The FAQ is posted online at: https://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/Downloads/FAQs-Physician-Self-Referral-Law.pdf at 8-9, a true and accurate copy of which is attached hereto as **Exhibit A**. As further discussed below, the FAQ was, in essence, re-issued (albeit in slightly different form) by Defendants on or about May 19, 2023. See https://www.cms.gov/files/document/frequently-asked-questions-cms-waivers-flexibilities-and-end-covid-19-public-health-emergency.pdf. A true and accurate copy is attached hereto as **Exhibit B**. The term "FAQ" as used herein should be construed as encompassing both the initial September 2021 FAQ **and** the more recent iteration issued in May of this year (and any subsequent substantively identical FAQ that may issue during the course of this litigation, if any).

from cancer and to restore the tools previously available to community oncology practices across the nation prior to the FAQ's unlawful promulgation.[2]

2.    The oldest and sickest Americans insured by Medicare and other federally-funded programs, especially those in rural areas, often cannot physically travel to a community oncology practice to personally pick up their cancer medications due to complications stemming from their illness or lack of access to transportation (or funds). Having their cancer medications and supportive therapies furnished to them by delivery – directly from their very own trusted oncologists – was a way for them to seamlessly, timely, and regularly receive life-extending drugs while maintaining the strength of the physician-patient relationship, unbroken by intermediary parties with no meaningful relationship to beneficiaries. The FAQ's harms thus target some of this country's most vulnerable citizens – those most in need of *more options and not less* in the delivery of healthcare and oncology services.

3.    Defendants' decision to issue the FAQ is not only morally and socially wrong, but also legally infirm. It is legally infirm because CMS made a substantive amendment to an existing rule via the FAQ, without proceeding with the statutorily required formal notice and comment rule-making process and, by doing so, violated, *inter alia*, the Medicare Act (42 U.S.C. § 1395hh) and the Administrative Procedure Act ("APA") (5 U.S.C. § 553(b).

4.    Nor is the FAQ narrow in application or small in scope. Initially published in September of 2021, CMS, through the FAQ, banned community oncology practices from furnishing lifesaving cancer drugs by courier, mail, UPS, FedEx, or even pick-up by a patient's trusted caregiver. This has resulted and will inevitably continue to result in worsening health disparities in cancer care. Those with the least means of affording transportation to pick up drugs will be the most greatly

---

[2] Approximately 13% of the 63 million Medicare beneficiaries suffer from cancer and approximately 70% of all cancer care occurs at community oncology practices. Given those figures, roughly 5.7 million Americans are affected by the FAQ.

impacted – they will be, *de facto*, forced into a (likely) Pharmacy Benefit Manager-owned ("PBM") mail-order delivery pharmacy.[3] Alternatively – and this is a tragic reality – there will be some guaranteed percentage of patients who simply no longer get their cancer medications, and will suffer terribly for it.

5.      The problem with a shift to third-party pharmacies is that many cancer drugs are not available at retail pharmacies and mail order specialty pharmacies are riddled with issues, such as delays, coverage and prior authorization-related confusion and delays, incorrect prescriptions, in addition to their lack of ability/resources to provide patient education for the handling of the often highly toxic oral oncolytics.  In addition, patients do not have a relationship with mail order specialty pharmacies and some patients have reported further issues such as language barriers and the inability for mail receipt because they cannot receive mail except at a Post Office box many miles from where they live because they lack a traditional mailbox.

6.      The inherent dangers of the FAQ's continued implementation, as described herein, are not hyperbolic – they are real, present, and irreparably injurious, being recognized as such even by members of the United States Congress, who, on April 28, 2023, wrote a letter outlining their "grave concerns" about the FAQ's dangerous implications and effects.[4]  The letter, signed by 54 members of Congress, "strongly urged [CMS] to retract the FAQ." Id.

7.      The FAQ, therefore, is no trifling matter, and the fact that it was issued quietly and without feedback as a "frequently asked question" on a random agency webpage is as outrageous as it is dangerous. It serves, in Plaintiff's view, as a textbook example of precisely why the Medicare Act and the APA require public notice and comment before a proposed rule becomes law. Without such

---

[3] As the Court is likely aware, PBMs are currently the subject of intense Congressional scrutiny and proposed remedial legislation.
[4] A true and accurate copy of the letter is attached hereto as **Exhibit C**.

mandated public discourse, reckless, dangerous and unconstitutional changes in healthcare policy can and will occur, as is the case here.

**B.** *Promulgation and continued enforcement of the FAQ is a violation of law.*

8.    Because the FAQ "establishe[d] or change[d] a substantive legal standard governing the scope of benefits" and "the eligibility of individuals [and] entities … to furnish or receive services or benefits under [Medicare,]" CMS violated the notice and comment rule-making requirement of the Medicare Act, as codified at 42 U.S.C. § 1395hh(a)(2). Such a violation is clear here since, previous to the FAQ, CMS had never established an express or even implied prohibition on furnishing physician-dispensed medications by delivery under Stark.  CMS' new prohibition, through the FAQ, thus established a new substantive legal standard, or, at minimum, has changed the preexisting legal standard, by which most in-office dispensing physicians – and in particular, oncologists – abided by over the course of decades.  That standard is tied directly to their "eligibility . . . to furnish services . . . under" Medicare.   42 U.S.C. § 1395hh(a)(2).

9.    For the avoidance of doubt, prior to CMS' illegal issuance of the FAQ, the agency had issued no rules or agency guidance expressly prohibiting the furnishing of medications by delivery under the in-office ancillary services ("IOAS") exception to Stark. The lack of prior agency guidance is implicit in the FAQ itself since, were it otherwise, CMS would have had no need to issue the FAQ in the first instance – particularly more than twenty-years after its passage into law. To the contrary, prior CMS agency guidance has, in fact, indicated that use of the IOAS exception to Stark to furnish medications via delivery may be acceptable under appropriate circumstances. Considering this, it follows that the FAQ is more than a non-substantive explanatory gloss on the IOAS exception but, instead, constitutes a substantive and material modification to the rule's meaning, thereby establishing or changing a substantive legal standard without notice and comment in violation of law.

10.    Indeed, HHS's own agency guidance comports with Plaintiff's position that the FAQ violates the Medicare Act. Specifically, following the Supreme Court's decision in *Azar v. Allina Health Services*, 139 S. Ct. 1804 (2019), HHS issued a memo in which it opined: "[t]he critical question [in determining whether the Medicare Act's notice and comment requirement has been violated] is whether the violation of the Medicare rule could be shown absent the guidance document. If the answer is no, then the guidance document establishes a norm and, under *Allina*, is invalid unless issued through notice-and-comment rulemaking."  HHS Advisory Opinion 20-05 on Implementing Allina dated December 3, 2020.[5]

11.    Here, the answer is **no**—violation of the Medicare rule at issue could not be shown absent the FAQ's new (and unlawful) guidance.  The FAQ thus establishes a norm that violates the Medicare Act.

12.    The FAQ also violates the APA.

13.    Specifically, the FAQ improperly expands the scope of the "location requirement" of the IOAS exception, codified at 42 C.F.R. § 411.355(b)(2), by making it per se unlawful to **dispense** designated health services ("DHS")[6] that are not supplied to the patient on-site at their physician's office, a prohibition that is at odds with the plain language of subsection (b)(5) of the same rule.  More specifically, the  FAQ amends the rule for "furnishing a service," codified at 42 C.F.R. § 411.355(b)(5), by making satisfaction of (b)(2)'s office location provision both a necessary and sufficient condition to lawfully "furnish" DHS, including medications, under the IOAS exception, even though subsection (b)(5)'s plain language **also** permits providers to lawfully furnish dispensed DHS "in a manner that is sufficient to meet . . . applicable Medicare payment and coverage rules." *See* 42 C.F.R. § 411.355(b)(5)

---

[5] The advisory opinions is available online at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2101111604-mh-advisory-opinion-20-05-on-implementing-allina_12.03.2020_signed.pdf. A true and accurate copy of the memo is attached hereto as **Exhibit D**.
[6] Per 42 C.F.R. § 411.351, a "designated health service . . . means any of the following services . . . (ix) Outpatient prescription drugs."

("A designated health service is 'furnished' for purposes of this paragraph (b) in the location where the service is actually performed upon a patient <u>or where an item is dispensed to a patient in a manner that is sufficient to meet the applicable Medicare payment and coverage rules</u>") (emphasis added). In other words, the FAQ creates a new legal requirement or standard that is inconsistent with the actual regulation and acceptable regulatory construction. It requires that DHS be provided directly to the patient in the physician's office, without exception, ***and*** in a manner that is sufficient to meet applicable Medicare billing and coverage rules, thereby rendering the entire second half of subsection (b)(5) redundant and meaningless, a result the law will not tolerate.

14.     Under well-settled APA law, an amendment to a legislative or substantive rule, such as § 411.355(b)(2) and (b)(5), must itself be legislative.  Given the absence of public notice and comment, issuance of the FAQ thus runs afoul the APA and must be nullified as such.

15.     Finally, the FAQ likely violates the 10th Amendment to the United States Constitution because its effect is to prohibit physicians – and, in particular, oncologists – from the ability to furnish in-office dispensed drugs to their patients by way of delivery. A number of States have exercised their police powers, however, by creating regulatory schemas governing the practice of medicine and pharmacy that permit delivery. Because the regulation of the professions, including physicians, fall squarely within the States' police powers, the FAQ's interference with such States' regulatory schemas constitutes federal interference with those "powers . . . reserved to th[ose same] States . . ." *U.S. Const. Amend. X.*

## C. <u>An exceedingly strong public interest would be served by granting the relief sought through this application.</u>

16.     The public interest implicated by this suit cannot be overstated. The FAQ prevents cancer patients from receiving their oral oncolytic drugs from their chosen community oncologist via a reliable, convenient, and (often) clinically optimal method of delivery.  This, in turn, has interfered

and will inevitably continue to interfere with patient medication adherence;[7] will sub-optimally interfere with physicians' ability to monitor dispensing and adherence in real time; will cause delays in commencing and continuing life-extending therapies; and, in some cases, will result in a lack of access to the drugs altogether. The FAQ likewise precludes patients from having their trusted caregivers from picking up their medications at the patients' oncologists' offices,[8] thereby forcing the (often very sickly) patients themselves to schedule and allot additional time and resources to find transportation and travel to their oncologists' offices, which has and will continue to create all of the same above-mentioned adherence issues. **To put it bluntly, the FAQ will inevitably cause some percentage of cancer patient deaths.**

17.     On the other hand, were the FAQ set aside as unlawful (as it should be), community oncologists and their practices will be re-empowered to furnish lifesaving medications and supportive therapies by delivery (or by pickup by the patient's trusted caregiver), thus ensuring better patient medication adherence through more effective and direct patient communication and education, active monitoring for and management of any adverse effects or non-adherence, and provide timely treatment plan adjustments to potentially save lives.

---

[7] "Medication adherence is defined by the World Health Organization as 'the degree to which the person's behavior corresponds with the agreed recommendations from a health care provider.'" *Patient Medication Adherence:      Measures      In      Daily      Practice* (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3191684/#r1) (quoting Dobbels F, Van Damme-Lombaert R, Vanhaecke J, De Geest S. Growing pains: non-adherence with the immunosuppressive regimen in adolescent transplant recipients. *Pediatr Transplant* 2005. Jun;9(3):381-390).

[8] The FAQ not only precludes oncologists from furnishing physician-dispensed medications to their patients by delivery pursuant to the IOAS exception – *it prohibits all physicians of any type from doing so*. See FAQ at **Exhibits A & B** (announcing an undifferentiated prohibition on any and all furnishing of physician-dispensed medications to patients via delivery).  By way of example, Idaho Urological Institute, PA ("IUI"), as noted in its Affidavit (**Exhibit K**), is not an oncology practice but employs urologists treating patients with prostate cancer. Thus, IUI – a member of COA – and other specialty practices involved in physician dispensing, such as urologists treating patients with prostate cancer, have suffered irreparable harm as a result of the FAQ in the same way that COA's community oncology practices have.

18.    Aside from the terrible inconvenience and burden that the FAQ places on Medicare and Medicaid seniors and disabled beneficiaries in obtaining access to life-saving medications, CMS is inexplicably gifting pharmacy benefit managers ("PBMs") and their affiliated or wholly-owned mail order pharmacies with the power to eliminate physician-dispensed oral cancer drugs and other serious disease medications from PBM networks, as PBM networks will rely on the FAQ as justification for precisely that. The FAQ will thus further increase the monopsony power of PBMs and their vertically integrated insurance companies, specialty pharmacies, and only tighten the stranglehold they already have over the pharmacy space more broadly.

19.    The independent community oncology practices and other cancer-care practices have and will continue to suffer proximately caused irreparable harm via loss of hard-fought patient goodwill, as those patients who previously relied upon their oncologists' ability to deliver in-office physician-dispensed medications, will no longer be able to do so.  Medicare beneficiaries will (and have already begun to), in the first instance, move to PBM-backed specialty mail order pharmacies, where they will receive comparatively suboptimal care, for their cancer drugs.  These same patients will also likely transfer care to large, private-equity-backed hospital systems, where they will not receive the same level of individualized care that they can in a community (and often local) oncology setting.

20.    For similar reasons, referring providers will begin (and have already begun) to cease referring patients to community oncology practices, knowing that, with the (unlawful) issuance of the FAQ, the clinically crucial tool of furnishing in-office dispensed medications via delivery is no longer available. The loss of both patient and referring provider goodwill is a tremendous and irreparable blow to the community oncology practices and other cancer-care practices whom COA represents.

21.    The injunctive relief sought through the accompanying application for preliminary restraints ought to be granted in light of the foregoing, as it will stem the above-described harm and

maintain the previously existing status quo until the merits of Plaintiff's arguments have been fully adjudicated by this Court.

22.     For these reasons and those that follow, Plaintiff respectfully requests that this Court preliminarily enjoin and restrain CMS from enforcing the FAQ as against COA and its members, pending the Court's review and adjudication of the claims set forth herein.

## THE PARTIES

23.     Plaintiff is a non-profit organization dedicated to advocating for independent community oncology practices and, most importantly, the patients they serve. COA is the only organization dedicated solely to independent community oncology practices where the majority of Americans with cancer are treated.

24.     COA's mission is to ensure that cancer patients receive quality, affordable, and accessible cancer care in their own communities.  The vitality of the community cancer care delivery system is critical to continue the steady success in combating the disease through earlier detection, diagnosis, and treatment.  The CMS FAQ severely hampers the success made in cancer treatment and will result in a higher mortality rate.

25.     Defendant Becerra is sued in his official capacity as Secretary of HHS.

26.     Defendant HHS is a cabinet-level Executive branch department of the federal government charged with protecting the health of the American people by providing essential human services.

27.     Defendant Brooks-LaSure is sued in her official capacity as Administrator of CMS.

28.     Defendant CMS is the federal agency within HHS charged with the administration of the Medicare program and works with state governments to administer the Medicaid program.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over the claims presented in this action pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. §§ 701-706, *et seq.*

30.     This Court has personal jurisdiction over Defendants because Defendants are primarily located within the District of Columbia, Defendant HHS's headquarters are located within the District of Columbia, Defendants transact business within the District of Columbia, provide or assists in providing health benefits to individuals residing within the District of Columbia, committed the acts and omissions giving rise to this lawsuit principally within the District of Columbia, and enforce the rules and regulations of the federal health programs in the District of Columbia.

31.     Plaintiff's principal location is also within the District of Columbia.

32.     Venue is proper in this District pursuant to 28 U.S.C. 1391(e).

33.     Judicial review is permitted, and the federal government's sovereign immunity is waived pursuant to 5 U.S.C. § 702.

## FACTS

### I.     Statutory and Regulatory Background.

34.     Medicare Part D is the voluntary outpatient prescription drug benefit for Medicare enrollees and is provided through, among other means, private health insurance plans that are contracted with the federal government. Medicare Part D is funded using federal monies drawn from the Supplementary Medical Insurance trust fund, which draws its revenues primarily from the federal general fund and premium payments from Medicare Part D beneficiaries.

35.     Pursuant to Stark, a physician may not refer any DHS, such as an outpatient prescription drug, to an individual or entity with whom the physician has a financial relationship. *See* 42 U.S.C. § 1395nn. Failure to abide by Stark, a strict liability statute, can result in devastating civil or criminal liability, which may include fines, penalties, trebled damages, exclusion from participation in

Federal Health care programs, and lengthy prison sentences. *Id.*; *see also U.S. ex rel. Riedel v. Boston Heart Diagnostics Corporation*, 322 F.Supp.3d 48, 66 (D.D.C. 2018) (noting how a Stark law violation may serve as a predicate for a False Claims Act action); *https://oig.hhs.gov/compliance/physician-education/fraud-abuse-laws/#:~:text=The%20Stark%20law%20is%20a,the%20law's%20restrictions%20on%20referrals*.

36.     Under section 1877(h)(6)(J) of the Social Security Act (SSA), an "outpatient prescription drug" is a DHS.  Physicians that in-office physician dispense or that dispense via practice-owned pharmacies may, in the absence of an appropriate exception or safe harbor, trigger Stark law liability by virtue of their financial relationship in either the practice or the pharmacy to which the prescription drug order is referred.  In such circumstances, a Stark exception must be met in order to avoid liability thereunder.

37.     One widely-employed Stark exception applied under the above-circumstances is the so-called In-Office Ancillary Services or IOAS exception, which requires that certain supervisory, billing, and location requirements be met.

38.     The IOAS exception was the product of formal rule-making, which resulted in the passage of a final rule published in 2001, as codified at 42 C.F.R. § 411.355(b).

39.     Among other things, the 2001 Rule provides that the "location where [a] service is furnished" is generally in the same building as the physician's office (42 C.F.R. § 411.355(b)(2)), and additionally and distinctly provided that a "designated health service is '**furnished**' for purposes of this paragraph (b) in the location where the service is actually performed upon a patient **or** where an item is dispensed to a patient in a manner that is sufficient to meet the applicable Medicare payment and coverage rules." 42 C.F.R. § 411.355(b)(5) (emphasis added).  The disjunctive "or" is key to reasonably and correctly construing this provision, in addition to understanding how the FAQ substantively and materially changed the provision's meaning, rendering the FAQ an unlawful and unconstitutional agency rule.

40.     Thus, consistent with § 411.355(b)(5), a physician may compliantly "furnish" a drug for purposes of the IOAS exception by in-office dispensing a drug and providing it to the patient in the office *or* by dispensing the drug to the patient in a "manner that is sufficient to meet . . . applicable Medicare payment and coverage rules." *Id.* Because Medicare payment and coverage rules contemplate reimbursement for DHS, including medications that are in-office dispensed and furnished to a patient via delivery (e.g., FedEx or the USPS), the language following the disjunctive "or" in § 411.355(b)(5) permitted – *until promulgation of the unlawful FAQ* – physicians to in-office dispense medications and furnish them by way of delivery to their patients.

41.     Notably, Medicare did not cover outpatient prescription drugs until January 1, 2006, when it implemented the Medicare Part D prescription drug benefit, authorized by Congress under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. Indeed, Medicare Part D was not in existence when the final rule for the IOAS exception provision was first published in 2001.

42.     In 2020, shortly after the onset of the COVID-19 Public Health Emergency ("PHE"), CMS suspended enforcement of (or "waived") the "location requirement" for purposes of 42 C.F.R. §411.355(b)(2) ("COVID Waivers"). The COVID Waivers terminated with the lifting of the PHE, effective May 11, 2023.

43.     In September 2021, during the PHE, CMS posted the FAQ in response to a COVID Waiver-related question concerning where an item may be considered "furnished" for purposes of the 411.355(b)(2) location requirement.  In response to whether durable medical equipment can be mailed to a beneficiary's home, CMS acknowledged the regulatory text of 411.355(b)(5), stating "services are considered 'furnished' in the location where the service is actually performed upon a patient or where an item is 'dispensed to a patient in a manner that is sufficient to meet Medicare billing and coverage rules.'"

44.    The FAQ goes on to state that the exception for in-office ancillary services occurs "only when a patient directly receives the item in the physician's office <u>and</u> in a manner that is sufficient to meet applicable Medicare billing and coverage rules. The 'location requirement' at 42 C.F.R. §411.355(b)(2) would not be satisfied if a patient receives an item by mail outside the physician's office, as it would not be dispensed to the patient in the office. This is true <u>regardless of whether Medicare coverage and payment rules would permit the supplier to mail the item to the patient and bill the Medicare program for the item</u>." <u>Id.</u> (emphasis added).

45.    Specifically, on this point, the FAQ states, in pertinent part, that:

Our policy has not changed since the effective date of the Phase I final rule. The "location requirement" at 42 C.F.R. §411.355(b)(2) requires that the patient receive the item in the physician's office. Put another way, items that are designated health services to which the exception is applicable, such as intermittent catheters (which are prosthetic devices), fall within the scope of the exception for in-office ancillary services only when a patient directly receives the item in the physician's office and in a manner that is sufficient to meet applicable Medicare billing and coverage rules.

[**Exhibit A** at 9.]

46.    Despite the FAQ's incorrect representations regarding CMS' "policy . . . not chang[ing,]" the fact is that from the date of the IOAS exception's lawful promulgation in 2001 until the September 2021 date of the FAQ's unlawful issuance, Defendants never issued any rules, regulatory or subregulatory guidance prohibiting physicians from using the IOAS exception to lawfully furnish in-office dispensed medications to their patients via delivery.

## II.    The FAQ Violates the Medicare Act, the APA, and the 10th Amendment.

### A.    Summary of the Claims.

47.    The FAQ is an unlawful rule in the guise of a policy declaration, promulgated without the statutorily required notice and comment period, thus precluding the public and key stakeholders from weighing in on its legality, its logistical workability/advisability, and, most importantly, its devastating clinical implications for vulnerable patients, including and especially cancer patients.

48.     The FAQ is unlawful because it has, in fact, rewritten § 411.355(b)(5). It has done so by establishing, for the first time, a prohibition on the furnishing of in-office dispensed medications to patients via delivery for drugs dispensed in a manner sufficient to meet applicable Medicare payment and coverage rules – a prohibition constituting a new substantive legal standard that is nowhere to be found in (b)(5)'s plain language.

49.     The FAQ has also rewritten § 411.355(b)(5) by repealing the provisions language following the word "or" and making (b)(2)'s location requirement both a necessary and a sufficient condition to comply with the rule, whereas previously it was only one means of satisfying the IOAS exception's prerequisites. *See* **Exhibit A** at 9. Prior to the FAQ, per the express language of (b)(5), an alternative lawful means of furnishing DHS pursuant to the IOAS was to "dispense [the DHS] to a patient in a manner that is sufficient to meet the applicable Medicare payment and coverage rules." *Id.* at (b)(5). This language has now been explicitly overridden by a FAQ not subject to notice and comment. *See* **Exhibit A** at 9 ("The 'location requirement' at 42 C.F.R. §411.355(b)(2) would not be satisfied if a patient receives an item by mail outside the physician's office, as it would not be dispensed to the patient in the office.  <u>This is true regardless of whether Medicare coverage and payment rules would permit the supplier to mail the item to the patient and bill the Medicare program for the item.</u>") (emphasis added).

50.     But for CMS to lawfully modify or supplement a rule that was originally the product of formal and lawful rule-making, it must undergo the rule-making process again. Here, Defendants failed to do so.

51.     The FAQ is also unconstitutional in its interference with preexisting State regulations governing the practice of medicine and pharmacy, which regulations fall squarely within the police powers reserved to the States and not the federal government.

### B.  The FAQ violates the Medicare Act.

52.    42 U.S.C. § 1395hh(a)(2) of the Medicare Act contains a notice and comment requirement.  In pertinent part, the statute requires that there must be public notice and a 60-day comment period for any "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Id.*

53.    The Supreme Court in *Azar v. Allina Health Services*, 139 S. Ct. 1804, 1808 (2019) said "[o]ne way or another, Medicare touches the lives of nearly all Americans. Recognizing this reality, Congress has told the government that, when it wishes to establish or change a 'substantive legal standard' affecting Medicare benefits, it must first afford the public notice and a chance to comment." *Id.*

54.    The purpose behind the formal rule-making component of the Medicare Act was to make sure that the agency does not "announc[e] 'important policies' without notice and comment." *Id.* at 1815.

55.    That is precisely what happened here – the agency announced a very significant policy by posting a "Frequently Asked Question" without any notice and comment from the public.

56.    CMS's FAQ does away with subsection (b)(5) and makes satisfying (b)(2)'s location requirement the only possible means of complying with IOAS exception.

57.    As such, the FAQ "establishes or changes a substantive legal standard governing the scope of benefits" and "the eligibility of individuals [and] entities … to furnish or receive services or benefits under [Medicare]" and therefore violates the notice and comment rule-making requirement of the Medicare Act.  42 U.S.C. § 1395hh(a)(2).

58.     Prior to the FAQ, CMS had never established an express prohibition on mailing or delivering drugs as a means of compliantly furnishing medications under Stark's IOAS exception. Thus, the FAQ established a new substantive legal standard or at minimum has changed the preexisting legal standard by which most in-office dispensing physicians – and in particular, oncologists – abided by over the course of decades, which standard is tied directly to their "eligibility . . . to furnish services . . . under" Medicare. *Id.*

59.     To reiterate, there were no previous agency rules or guidance expressly prohibiting delivery or mailing under IOAS exception; had there been, there would have been no need to issue the FAQ in the first instance.

60.     To the contrary, there is, in fact, authority indicating that furnishing in-office dispensed medications via delivery pursuant to the IOAS exception was and is permitted.  Medicare's Any Willing Provider Law, 42 U.S.C. § 1395w-104, provides that all Part D prescription plans must permit "the participation of any pharmacy that meets the terms and conditions under the plan," and "any pharmacy" includes physician dispensers, as recognized by CMS. *See, e.g.,* CMS Bulletin Dated 9/20/2011 RE: Medicare Prescription Drug Benefit Manual – Chapter 5 (referencing coverage of "Part D [medications] … purchased at an out-of-network pharmacy or in a physician's office . . ." and further recognizing that some pharmacies may utilize common carriers in order to meet the needs of their patients, such as Part D enrollees residing in LTC facilities or in remote areas); Medicare Prescription Drug Benefit Manual, Chapter 6, Part D Drugs and Formulary Requirements at 58 ("the law specifically authorizes coverage for … Oral Anti-Cancer Drugs … taken orally during cancer chemotherapy provided they … are used for the same indications as chemotherapy drugs that would be covered if they were not self-administered and were administered as incident to a physician's professional services.") (emphasis supplied).

61.     In light of the above and per the terms of its own advisory opinion drafted by its
General Counsel – HHS Advisory Opinion 20-05 on Implementing *Allina* – Defendants must concede
that the FAQ violates the Medicare Act.

62.     The Advisory Opinion 20-05 states that "[a] broadly-worded statute or regulation can
be interpreted in a variety of ways, and where HHS unilaterally issues discrete, binding criteria
purporting to explain statutory or regulatory requirements, that statement of policy will usually be
viewed as creating a new norm, in contravention of the Department's rulemaking obligations as
interpreted in *Allina*." *Id.* at 2. The Opinion goes on to state that: "The critical question is whether the
violation of the Medicare rule could be shown absent the guidance document. If the answer is no,
then the guidance document establishes a norm and, under *Allina*, is invalid unless issued through
notice-and-comment rulemaking." *Id.*

63.     A violation of a Medicare rule – in this case § 411.355(b)(5) – cannot be shown in the
absence of the FAQ.  Oncology practices and other cancer-care practices have been, prior to the FAQ
and consistent with § 411.355(b)(5)'s plain language, lawfully mailing and/or delivering cancer
medications to their patients to great clinical effect.  In other words, the FAQ has rendered what was
once lawful conduct under the Medicare rules unlawful. Per the terms of Advisory Opinion 20-05,
therefore, the FAQ is invalid under *Alina* given the undisputed absence of notice-and-comment
rulemaking in this case.

64.     Also, notice and comment rulemaking is a good thing.

65.     "Notice and comment gives affected parties fair warning of potential changes in the
law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid
errors and make a more informed decision.  Surely a rational Congress could have thought those
benefits especially valuable when it comes to a program where even minor changes to the agency's

approach can impact millions of people and billions of dollars in ways that are not always easy for regulators to anticipate." *Allina*, 139 S. Ct. at 1816 (internal citation omitted).

66.    Notice and comment would have been a good thing here, too, given that the FAQ impacted and continues to impact the lives of millions of Americans with cancer, and in particular the oldest and sickest of such Americans enrolled in the Medicare and Medicaid programs. This impact is yet further magnified in rural areas of the country where such patients often cannot physically travel the long distances necessary to get to a medical practice to personally pick up their cancer medications either due to complications of their illness or not having access to transportation.

67.    In the oncology space, endorsing a closer patient physician relationship through a medically integrated physician dispensing oncology model fosters drug adherence, promotes active monitoring and managing of any adverse effects, and allows for the creation of timely treatment plan adjustments to potentially save lives.

68.    There is little to no risk of program or patient abuse here. In other words, the FAQ does not further any of the underlying aims of the Stark law. It simply complicates medical and, in particular, oncological care for no justifiable reason.

69.    The notice and comment rulemaking process would have made this crystal clear. Tellingly, however, instead of allowing for public input and debate, the Defendants opted to legislate in the shadows, by casually posting on a CMS webpage. In so doing, Defendants violated the Medicare Act.

### C.  The FAQ violates the APA.

70.    Under the APA, legislative or "substantive" rules require notice of proposed rule-making in the Federal Register. Failure to comply with this requirement will result in vacatur or nullification of the unlawfully promulgated rule. *See* 5 U.S.C. § 553(b). Further, any change or amendment to a legislative rule under the APA must, itself, be made by way of a lawfully-promulgated

legislative rule. *Id.*; *see also Texas Children's Hospital v. Burwell*, 67 F. Supp. 3d 224, 241 (D.D.C. 2014) (citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995).

71.    The FAQ purports to give guidance on the "location requirement" of the IOAS exception (42 C.F.R. § 411.355(b)(2)). In so doing, however, the FAQ amends the rule for "furnishing a service" (42 C.F.R. § 411.355(b)(5)) by making the "location requirement" mandatory under any and all circumstances, even though subsection (b)(5) is, on its face, more permissive. *Compare* 411.355(b)(5) ("A designated health service is 'furnished' for purposes of this paragraph (b) in the location where the service is actually performed upon a patient _or where an item is dispensed to a patient in a manner_ _that is sufficient to meet the applicable Medicare payment and coverage rules_") (emphasis added), *with*, the FAQ ("The 'location requirement' at 42 C.F.R. §411.355(b)(2) would not be satisfied if a patient receives an item by mail outside the physician's office, as it would not be dispensed to the patient in the office.  This is true regardless of whether Medicare coverage and payment rules would permit the supplier to mail the item to the patient and bill the Medicare program for the item.").

72.    In other words, the FAQ requires DSH may ONLY be provided directly to the patient in the physician's office AND in a manner that is sufficient to meet applicable Medicare billing and coverage rules.  The FAQ thereby abrogates the second half of subsection (b)(5). CMS, through the FAQ, thus created or amended a substantive or legislative rule – and did so without proceeding with the statutorily required notice and comment process in violation of the APA.

73.    The FAQ additionally constitutes a substantive and material agency "about-face" concerning the legality of furnishing medications via delivery under the IOAS exception, given that previous agency guidance indicated that doing so was lawful and compliant. This too constitutes the creation or modification of a legislative rule without notice and comment in violation of the APA.

74.    The FAQ was issued with the intent to speak with the force of law by prohibiting independent community oncology practices, and other independent specialty practices, from mailing

or delivering oral medication to its patients – even though CMS takes no issue with a patient picking up medication in-person from the practice site. This is entirely irrational, arbitrary and capricious – and harmful to patients.

75.    The primary purpose of the Stark law was to prevent situations where physicians would refer to their own entities while promoting patient choice. The FAQ circumvents, ignores and, ultimately, opposes patient choice in regards to receiving medications from their own trusted physicians by delivery. This is likewise inconsistent with existing federal law whereby Medicare beneficiaries have the federal statutory "freedom of choice" to get their medication from whatever provider they want. *See* 42 U.S.C. §1395a (Medicare freedom of choice law).

76.    There is little to no risk of program or patient abuse here. In other words, the FAQ does not further any of the underlying aims of the Stark law. It simply complicates medical and, in particular, oncological care for no justifiable reason.

77.    The notice and comment rulemaking process would have made this crystal clear. Tellingly, however, instead of allowing for public input and debate, the Defendants opted to legislate in the shadows, by casually posting on a CMS webpage. In so doing, Defendants violated the APA.

### D. The FAQ violates the 10th Amendment.

78.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., Amend. X.

79.    The Supreme Court made clear more than 100 years ago that "the police power of the states under the 10th Amendment extends to the regulation of certain trades and callings, particularly those which closely concern the public health. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." *Watson v. State of Maryland*, 218 U.S. 173, 176 (1910).

80.     Indeed, there are some state laws governing the practice of medicine that may be reasonably interpreted to permit the delivery or mailing of in-office physician dispensed medications.

81.     In Oklahoma, for example, the definition of "dispense" or "dispensing" is defined to mean "a prescription drug order <u>including the preparation and delivery of a drug . . . to a patient or a patient's agent . . . for subsequent administration to, or use by, a patient</u>." OK ST T. 59 § 353.1(12) (emphasis added). The term "licensed practitioner" is defined as a "physician . . . licensed to practice and <u>authorized to prescribe dangerous drugs within the scope of practice of such practitioner</u>." *Id.* at subpart (22) (emphasis added); <u>see also</u> Okla. Admin Code 510:5-3.5.

82.     Likewise, in Tennessee, "[p]hysicians may dispense [medications] ... to individuals with whom they have established a physician/patient relationship." TN ADC 0880-02-.14. "Dispense" is defined to mean "preparing, packaging, compounding or labeling <u>for delivery and actual delivery of a prescription drug</u> ... in the course of professional practice to a patient …" and "deliver" or "delivery" mean "the actual, constructive or attempted <u>transfer from one person to another whether or not there is an agency relationship</u>" of a medication. T.C.A. § 63-10-204(10), (14) (emphasis added).[9]

83.     When read together, the term "dispense" – which expressly contemplates some form of delivery – and the corresponding States' physician regulations that permit physicians to dispense prescription drugs creates a scheme, implemented and policed by the States' relevant boards, that permits such professionals to dispense, mail, or otherwise deliver medications to their patients.

---

[9] There are numerous other states with analogous regulations, including: Illinois (*see* 225 Ill. Comp Stat Ann 85/3(m)(m) and 225 ILCS 60/33); Maryland (*see* Md. Code Ann, Health Occ. 12-101:(j) and MD Health OCCUP 12-202); Minnesota (*see* Min. Stat. Ann 151.01 and MN ADC 6800.9950 and MN ADC 6800.9952); Montana (*see* Mont. Code. Ann 37-7-101:(14) and MT ST 37-2-104(1)); South Carolina (*see* S.C. Code Ann 40-43-30:(26) and SC ST 40-43-60(I) and (K)); West Virgina (*see* W. Va. Code Ann 30-5-4 and WV ADC 11-5-5.2).

84.     The FAQ, as currently written, interferes with the police powers of the States by clashing with those States' preexisting regulatory schemas governing the practice medicine and pharmacy.

85.     The FAQ's prohibition on delivering, mailing, or even having someone other than the patient pick up in-office dispensed (or physician-owned pharmacy dispensed) medications, interferes with State regulations that fall squarely within the well-settled police powers of such States.

86.     COA has members in a number of States with such schemas, including Oklahoma and Tennessee.

87.     As noted below, the FAQ directly clashed with and continues to directly clash with Oklahoma's (and those other similarly-situated above-referend States') preexisting regulatory schema which permitted, among other things, the furnishing of physician-owned-pharmacy dispensed medications to patients under appropriate circumstances.

88.     Because the FAQ violates the 10th Amendment and is therefore unconstitutional, it must be set aside as unlawful on this basis.

**III.    Congressional Involvement and Attempts to Avoid Judicial Intervention that were Spurned by CMS**

86.     At the March 29, 2023 House Energy & Commerce Subcommittee on Health hearing, Defendant Becerra told Representative Harshbarger that he would work with her to fix this regulatory error by CMS that puts seniors with cancer at risk of not receiving their medications.

87.     By way of letter dated April 4, 2023, COA followed-up with Defendant Becerra again reminded him of his representation that he would work to fix CMS's regulatory error that puts seniors with cancer at risk.

88.     In the letter, COA explained in detail the problems with the FAQ practically and legally.

89.     COA explained that the FAQ is a substantive rule that violates the APA because it was not the product of notice and comment rule-making.

90.     On April 28, 2023, Representatives of Congress wrote to Defendant Becerra and Defendant Brooks-LaSure memorializing their concern with the FAQ and the devastating impact it will have on cancer patients, most significantly elderly cancer patients and those who are underserved and in rural areas.  *See* **Exhibit C**.

91.     Specifically, the 54 Members shared their "grave concerns" that The FAQ prevents cancer clinics from being able to deliver life-saving treatments to their patients and greatly disrupts patient care.  *See id.* They "strongly urged [CMS] to retract the FAQ."  *Id.*

92.     The Congressional Members explained that the FAQ does not make sense practically. According to the CMS, drugs can be dispensed to a cancer patient in the doctor's office but cannot be delivered to the patient for the betterment of patient care, namely, to ensure there is no delay, to ensure adherence, and/or for other medically necessary purposes.  *See* **Exhibit C**.

93.     Congress also expressed that "given the substantive nature of the CMS FAQ," "the agency should retract the FAQ and issue formal rulemaking to solicit input from patients, their providers and others impacted, rather than have this regulation be the last Q&A in a nine-page FAQ." *Id.*

94.     On May 15, 2023, after expiration of the PHE waivers, Defendant LaSure sent Representatives Schultz and Harshbarger a letter reiterating CMS's position as set forth in the FAQ while noting that she will take Congress and COA's comments and concerns "into consideration as we move forward on these critical issues."

95.     Rather than take corrective measures, CMS doubled-down on its position.  On May 19, 2023, CMS issued another FAQ in an attempt to legally justify to the FAQ. *See* **Exhibit B**.

96.     Via the May 19, 2023 FAQ, CMS provided a plainly post-hoc rationalization for the FAQ's promulgation, stating (incorrectly) that the FAQ was "a longstanding CMS policy" and that beneficiaries need not worry because they can get their drugs delivered through Plan D's network of mail order and other pharmacies. *Id.* Conspicuously, the only citation provided for the assertion that the FAQ was consistent with "longstanding CMS policy" was a link to the 2021 FAQ. *Id.*

97.     CMS went on to state that it was "committed to ensuring beneficiaries' access to their prescription drugs," that it did "not anticipate any access issues" and "w[ould] closely monitor patient complaints to watch for any issues affecting patient access." *Id.* Troublingly, CMS further stated that Plan D Sponsor- (*i.e.*, PBM) "contracted pharmacy network[s] consisting of retail pharmacies [would be sufficient] to ensure that beneficiaries enrolled in Part D plans have convenient access to network pharmacies." *Id.*

98.     However, retail pharmacies generally do not carry the specialty cancer drugs COA's members' patients need, and mail order specialty pharmacies are prone to various forms of dispensing errors, in addition to having labyrinthine, Kafkaesque bureaucratic rules and red-tape, rendering them incredibly difficult and frustrating for patients to navigate.

99.      Since May 19, 2023 there have been access issues and numerous cancer patient complaints (*see* section V below).[10]  CMS has done nothing to right its wrong.

100.     Plaintiff exchanged many emails with CMS representatives and CMS representatives said that "nothing can be done because Stark is statutory."

101.     However, even if one were to accept, *arguendo*, that CMS's construction of § 411.355(b)(5) were correct (which we do not), the Secretary's response is telling since, even in such a case, his "nothing can be done" remark would still be demonstrably false. This is because the Stark

---

[10] In addition, COA publishes monthly newsletters that consistently include patient horror stories involving PBMs and receiving cancer drugs from Plan D's network of mail order pharmacies.

law contains a "catch-all" provision, codified at 42 U.S.C. §1395nn(b)(4)), entitled "Other permissible exceptions." This provision permits Defendant Becerra to fashion a Stark exception in "any other financial relationship which the Secretary determines, and specifies in regulations, does not pose a risk of program or patient abuse." *Id.* Oncology practices would fit such a catch-all perfectly. There is no risk of abuse – no one would seriously allege that oncology practices are chemotherapy "pill mills"; there is no risk of diversion of toxic oral oncolytics; and no one has a better medical understanding of the patient recipients of the medications at issue than their own treating oncologists. Given this, it begs the question: why is it that the Defendants continue to do nothing to address this critical issue affecting the public health when they have the legislative tools to do so? Respectfully, the undersigned can conjure no sensible or good faith answer to this question.

102.    In sum, Plaintiff (and Congress) attempted in good faith to work this out with Defendants to avoid having to bring this action – and Defendants had every opportunity to work with Plaintiff to do just that – but, for reasons known only to them, Defendants refused to do so.

### IV.    Oncology Practices' Prior Procedures and Successes Versus the Now Resulting Harm[11]

104.    Attached as **Exhibits E-H** and **Exhibits K-L**, which Plaintiff expressly incorporates herein, are signed Affidavits from six community oncology practices[12]: New Mexico Oncology Hematology Consultants, Ltd;[13] Oklahoma Cancer Specialists and Research Institute, LLC;[14] Hematology Oncology Associates of Central New York;[15] Hematology Oncology Associates of

---

[11] Section IV includes harm not only to oncology practices, but also to other specialty practices involved in physician dispensing, including urologists treating patients with prostate cancer.
[12] Plaintiff will supplement this Complaint and the record with additional affidavits from other community oncology practices.
[13] *See* **Exhibit E**.
[14] *See* **Exhibit F**.
[15] *See* **Exhibit G**.

Brooklyn;[16] Idaho Urologic Institute, PA;[17] and New York Cancer and Blood Specialists.[18]  Each of these community oncology practices are pillars in their communities (and surrounding regional areas) and provide state of the art, and clinically integrated, cancer care.

105.    Community oncology and physician dispensing practices, like those in Plaintiff's membership, generally operate under a "medically integrated dispensing" ("MID") model, specially tailored to the treatment of cancer, which requires affiliation and cooperation with physicians, nurses, pharmacists, technicians and staff specially trained in the treatment of cancer. This model is designed to enhance clinical results, in addition to helping patients navigate their difficult cancer journeys. *See* Affidavit of Kashyap Patel, M.D. attached hereto as **Exhibit I**, ¶ 15.

106.    Community oncology practices' MID model enable their dispensing pharmacy operations to have direct access to the practice's patients, their treating oncologists, and all of the patient's medical records and history (such as pathologies, labs, scans and office notes); all of which permits community oncology practices to provide a complete review of the patient's cancer medication treatments, coordinate those treatments with any intravenous or radiological chemotherapies the patient is receiving, and dispense life sustaining medications rapidly and effectively, all in real-time and when the patient needs them.[19]

107.    Given that a cancer diagnosis is generally more common in elderly persons, many patients of community oncology practices are old and sick, particularly their Medicare and Medicaid patient base, and require substantial assistance with mobility and transportation.[20]

---

[16] *See* **Exhibit H**.
[17] *See* **Exhibit K**.
[18] *See* **Exhibit L**.
[19] **Exhibit E**, ¶¶ 6, 10; **Exhibit F**, ¶ 6; **Exhibit G**, ¶ 6; **Exhibit H**, ¶ 5; **Exhibit K** ¶ 6; **Exhibit L** ¶ 5.
[20] **Exhibit E**, ¶11; **Exhibit F**, ¶ 12; **Exhibit G**, ¶ 8; **Exhibit H**, ¶ 8; **Exhibit K** ¶ 9; **Exhibit L** ¶ 10.

108.    To promote these patients' adherence to their cancer medication regimens, and to maximize health prognoses, subsequent to and until the expiration of the PHE COVID waivers, many community oncology practices offered their Medicare and Medicaid patients the option to have their prescription medications delivered to their home, or permitted relatives and/or designated representatives of their patients to pick up prescriptions in-office on their patients' behalf.[21]

109.    During the PHE, community oncology practices implemented business and operating procedures to promote the safe, efficient and clinically appropriate dispensing and subsequent delivery of cancer medications to Medicare and Medicaid beneficiaries.[22] The practices commonly track all prescription drug deliveries and require that the receiving patient (or that patient's relative or designated representative) sign for the delivery upon receipt.[23] During the PHE, community oncology practices also tracked the progression of their patient's prescriptions to proactively dispense and deliver prescriptions to patients who would run out of their prescriptions before their next appointment. The ability to deliver to patients in between office visits was not only convenient, but also promoted patient medication adherence—a clinically significant option now precluded by the FAQ.[24]

110.    Although the community oncology practices make reasonable efforts to schedule patient office visits with their treating hematologist/oncologist to coincide with the date the patient's prescriptions are ready for pick up, there are numerous clinical needs and benefits (as detailed below)

---

[21] **Exhibit E**, ¶ 12; **Exhibit F**, ¶ 13; **Exhibit G**, ¶ 9; **Exhibit H**, ¶ 9; **Exhibit K** ¶ 11; **Exhibit L** ¶ 13.

[22] **Exhibit E**, ¶ 16; **Exhibit F**, ¶ 16; **Exhibit G**, ¶ 12; **Exhibit H**, ¶ 13; **Exhibit K** ¶ 13; **Exhibit L** ¶ 16.

[23] **Exhibit E**, ¶ 17; **Exhibit F**, ¶ 17; **Exhibit G**, ¶ 13; **Exhibit H**, ¶ 14; **Exhibit K** ¶ 14; **Exhibit L** ¶ 17.

[24] **Exhibit E**, ¶ 18; **Exhibit F**, ¶ 18; **Exhibit G**, ¶ 14; **Exhibit H**, ¶ 15; **Exhibit K** ¶ 15; **Exhibit L** ¶ 18.

for the practices to be able to deliver life-sustaining cancer medications directly to its patients—a clinically significant option now precluded by the FAQ.

111.     Community oncology practices that dispense oral cancer medications are essential to the healthcare delivery system in that they provide unique and essential services that standard mail order and retail pharmacies cannot, including, but not limited to: (1) storing, acquiring and dispensing highly-sensitive, toxic and expensive specialty oncology medications;[25] (2) working closely with insurance companies to obtain "prior authorization" (and therefore coverage) for these expensive medications;[26] (3) sourcing and securing patient financial assistance;[27] (4) patient education programs;[28] (5) patient medication adherence programs; and (6) superior (and personalized) patient care, where medications are dispensed (and during the PHE delivered) in a safe, efficient, and clinically appropriate manner.

112.     Community oncology practices provide services above and beyond what are commonly experienced by patients at large mail order pharmacies. For example, community oncology practices often stay open late, and past normal business hours, to meet patients (or their caregivers during the PHE) traveling long distances to pick up life sustaining medications. They also meet patients (or their caregiver during the PHE) halfway to the pharmacy to reduce the travel times for distant patients.[29]

113.     Community oncology practices, being rooted in their local and regional communities, also provide services that cater to the unique needs of the patients they serve. Practices located in areas

---

[25] **Exhibit E**, ¶ 22; **Exhibit F**, ¶ 20; **Exhibit G**, ¶ 16; **Exhibit H**, ¶ 17; **Exhibit K** ¶ 17; **Exhibit L** ¶ 20.

[26] **Exhibit E**, ¶ 26; **Exhibit F**, ¶ 22; **Exhibit G**, ¶ 18; **Exhibit H**, ¶ 19; **Exhibit K** ¶ 19; **Exhibit L** ¶ 24.

[27] **Exhibit E**, ¶ 34; **Exhibit F**, ¶ 28; **Exhibit G**, ¶ 27; **Exhibit H**, ¶ 24; **Exhibit K** ¶ 27; **Exhibit L** ¶ 33.

[28] **Exhibit E**, ¶ 27; **Exhibit F**, ¶ 23; **Exhibit G**, ¶ 19; **Exhibit H**, ¶ 20; **Exhibit K** ¶ 20; **Exhibit L** ¶ 25.

[29] **Exhibit F**, ¶ 27.

with large minority populations have specially trained staff, and have implemented policies and procedures, to ensure the same superior levels of care are provided for persons with language barriers, or who have limited means to travel to the office regularly.[30]

114.    The MID model employed by community oncology practices enables these practices to provide superior levels of oncology and oncology pharmacy care to patients as compared to retail or centralized mail order pharmacies because the practices' patients are able to see their doctors, receive their prescriptions, fill their prescriptions from the same provider, and then have their medications modified or supplemented as may be clinically appropriate – all in real time. Delivering the drug from community oncology practices clinically integrated pharmacies allows coordination of this multimodality therapy, which is essential for optimal outcomes and the timely commencement of treatment. New Mexico Oncology Hematology Consultants, Ltd, for example, made all reasonable efforts to deliver medications to patients within four (4) days from receipt of the prescription during the PHE.[31]

115.    In contrast, when patients try to get their cancer medications from large mail order pharmacies, patients have reported having to wait weeks or more to receive delivery of initial shipments of their life-sustaining cancer medications.[32] Patients dealing with large mail order pharmacies  also have received drug shipments of medications that the patient's oncologist has long since discontinued, resulting in patients taking ineffective (at best) and deadly (at worst) medications.[33] These delays, common in centralized mail order pharmacies in delivery are not without clinical consequence.

---

[30] **Exhibit E**, ¶ 32; **Exhibit F**, ¶ 27.
[31] **Exhibit E**, ¶ 30.
[32] **Exhibit E**, ¶ 30; **Exhibit F**, ¶ 23; **Exhibit G**, ¶ 19; **Exhibit H**, ¶ 20; **Exhibit K** ¶ 24; **Exhibit L** ¶ 29.
[33] **Exhibit E**, ¶ 31; **Exhibit G**, ¶ 23.

116.    Patients using centralized mail order pharmacies also commonly have to suffer through complex and highly-bureaucratized system, marked by endless wait-times on frustrating phone calls to customer service; confused and poorly-informed pharmacy customer service representatives who are rarely actually pharmacists (or clinicians of any kind) and have no direct knowledges of the patients they are speaking with; and arcane, endlessly-confusing payor rules they must attempt to navigate alone, which do nothing other than extend the time spent waiting for the patients' life-saving or life-extending medications.[34]

117.    Large centralized mail order pharmacies also provide clinically inferior services as compared to community oncology practices. By way of example only, patients of Hematology Oncology Associates of Central New York suffering from metastatic breast cancer are typically prescribed both the expensive specialty cancer medication and CDK4/6 inhibitor Ibrance and the anti-estrogen medication Letrozole (which is generally less expensive than Ibrance, and thus carries a generally lower reimbursement rate to the pharmacy from the patient's insurance).[35] It is standard practice for these medications to be taken together by the patient and managed as a combined regimen. In fact, peer-reviewed studies have concluded that when taken together as a combined treatment, Ibrance and Letrozole reduce the risk of disease progression by 42%.[36] Hematology Oncology Associates of Central New York always dispenses both Ibrance and Letrozole to its patients, as is clinically appropriate and beneficial for its patients.[37] In contrast, however, Hematology Oncology Associates of Central New York's patients have reported instances of large chain and centralized mail order pharmacies electing only to dispense Ibrance to patients (to seek the greater reimbursement from the patient's Medicare and/or Medicaid insurance) and declining to fill their Letrozole

---

[34] **Exhibit E**, ¶ 32; **Exhibit F**, ¶ 26; **Exhibit G**, ¶ 26; **Exhibit H**, ¶ 23; **Exhibit K** ¶ 24; **Exhibit L** ¶ 30.

[35] **Exhibit G**, ¶ 26

[36] *Ibid.*

[37] *Ibid.*

prescription, requiring patients instead to go to another pharmacy to obtain this necessary and lifesaving combination therapy, causing unnecessary delay, confusion and frustration.[38]

118.    The FAQ creates immediate and irreparable harms to Plaintiff's members and their patients.[39]

119.    If the FAQ is permitted to stand, Plaintiff's members will suffer immediate and irreparable injury to their businesses, goodwill, reputations and expectancies of continued patronage.[40]

120.    Plaintiff's members will lose substantial percentages of their total patient base if the FAQ is not enjoined—likely to large centralized mail order pharmacies where these patients will not receive the same level of medically integrated care they otherwise would have received from Plaintiff's members.[41]

121.    Plaintiff's members' reputations as premier specialty oncology providers for Medicare and Medicaid patients, with the ability to deliver life-saving cancer medications in a clinically safe and efficient manner, will be irreparably destroyed.[42]

122.    In addition, if the FAQ is not enjoined, Plaintiff's members will lose access to an incalculable number of current and prospective new patients that are enrolled in Medicare and/or Medicaid prescription drug plans that plans that either prefer to have their prescriptions delivered to

---

[38] *Ibid.*

[39] **Exhibit E**, ¶¶ 35-55; **Exhibit F**, ¶¶ 29-46; **Exhibit G**, ¶¶ 28-45; **Exhibit H**, ¶¶ 25-44; **Exhibit K** ¶¶ 28-45; **Exhibit L** ¶¶ 34-52.

[40] **Exhibit E**, ¶ 35; **Exhibit F**, ¶ 29; **Exhibit G**, ¶ 28; **Exhibit H**, ¶ 25; **Exhibit K** ¶ 28; **Exhibit L** ¶ 34.

[41] **Exhibit E**, ¶¶ 37-38 (noting that approximately 61% of the practice's patients were enrolled in Medicare and/or Medicaid prescription drug plans, and that it will lose at least 1,580 patients from enforcement of the FAQ); **Exhibit F**, ¶¶ 31, 32, 34 (noting that approximately 53% of the practice's patients were enrolled in Medicare and/or Medicaid prescription drug plans, and that it will lose at least 425 patients from enforcement of the FAQ); **Exhibit G**, ¶¶ 29-31 (noting that approximately 50% of the practice's patients were enrolled in Medicare and/or Medicaid prescription drug plans, and that it will lose at least 20% of its Medicare and/or Medicaid patients from enforcement of the FAQ); **Exhibit H**, ¶¶ 22, 29-30; **Exhibit K** ¶¶ 30-31; **Exhibit L** ¶¶ 44-45.

[42] **Exhibit E**, ¶ 39; **Exhibit F**, ¶ 33; **Exhibit G**, ¶ 32; **Exhibit H**, ¶ 30; **Exhibit K** ¶ 32; **Exhibit L** ¶ 38.

them or, due to health, financial or other reasons are unable to personally pick up their cancer medications in-office.[43]

123.    The oncology practices will suffer irreparable harm via loss of continued patronage because physicians will cease referring patients to community oncology practices – knowing they won't be able to provide full levels of service to their Medicare/Medicaid patients, and the ability to provide the same optimal levels of care to Medicare/Medicaid patients that those in commercial health insurance plans would receive.

124.    Plaintiff respectfully requests that this Court temporarily enjoin and restrain CMS from enforcing the FAQ regarding the location requirement of the In-Office Ancillary Services Exception against oncology practices, pending the Court's review of the claims set forth herein.

## V.    10th Amendment Violations.

125.    The FAQ clashes with States' police powers in violation of the 10th Amendment and, in particular, States' abilities to regulate the practice of healthcare professionals, including physicians.

126.    The police power of the states under the 10th Amendment extends to the regulation of practitioners of medicine.

127.    A number of States – including without limitation Tennessee, Oklahoma, Illinois, Maryland, Minnesota, Montana, South Carolina, and West Virginia – have promulgated rules regulating the practice of medicine and pharmacy through which physicians may furnish in-office dispensed medications via delivery.

128.    COA has constituent oncology practice members in a number of the foregoing States, including Oklahoma and Tennessee. By way of example but not limitation, one such practice member

---

[43] **Exhibit E**, ¶ 40; **Exhibit F**, ¶ 34; **Exhibit G**, ¶ 33; **Exhibit H**, ¶ 31; **Exhibit K** ¶ 33; **Exhibit L** ¶ 39.

is Oklahoma Cancer Specialists and Research Institute, LLC, ("OCSRI"), an Oklahoma-based oncology practice, who has submitted an Affidavit in support of this application herewith.

129.    As noted in the OCSRI's submission, prior to the promulgation of the FAQ, the Oklahoma Board of Pharmacy ("OKBOP") generally permitted physician-owned pharmacies to furnish medications to patients via delivery. This is consistent with Oklahoma's preexisting regulatory schema governing the practice of pharmacy and the practice of medicine. *See* OK ST T. 59 § 353.1(12), and (22); Okla. Admin. Code. 510:5-3-5; Okla. Admin. Code 435:10-7-1. Indeed, a plain reading of the afore-cited statutes and regulations more broadly permitted the furnishing of in-office physician-dispensed medications, including cancer medications, to patients via "delivery." *See* OK ST T. 59 § 353.1(12), and (22); Okla. Admin. Code. 510:5-3-5; Okla. Admin. Code 435:10-7-1.

129.    The FAQ directly clashes with the foregoing regulatory schema, to the detriment of Oklahoma oncologists who, prior to it, were, per the foregoing law, able to more optimally care for patients by availing themselves of the ability to furnish cancer medications to patients via delivery.

130.    Notably, prior to the issuance of the FAQ, the OKBOP did not permit physician-owned pharmacies to ship medications to other practice locations, absent a showing of compelling need (e.g., the patient was homeless and, as such, had no home to which the pharmacy could mail the cancer medications). After the promulgation of the FAQ, however, the OKBOP, being apprised of the FAQ and its federal implications for physicians seeking to furnish medications by delivery, modified the standards by which it would permit physician-owned pharmacies to mail medications to other practice locations, as the OKBOP understood that patients' only alternative was to switch to the problematic, often-PBM-owned mail order specialty pharmacies.

130.    In short, the FAQ directly and concretely clashes with Oklahoma's preexisting regulatory schema governing the furnishing of physician-dispensed medications (or physician-owned

pharmacy dispensed medications) to patients via delivery to the detriment of Oklahoma's physicians and patients alike.

131.   The FAQ violates the 10th Amendment because the prohibition on mailing drugs to patients pursuant to the In-Office Ancillary Services exception to Stark interferes with the police powers of States whose Boards of Pharmacy and Medical Examiners regulations permit mailing of in-office, physician-dispensed medications.

**VI. Nature of Harm to Patients**

132.   Not only will Plaintiff's members be irreparably harmed by the FAQ, but so will cancer patients across the country.

133.   Community oncology practices improve patient lives and maximize patient outcomes through, among other means: shortening delays between physician care and receipt of oncology medications; easy access to patient records and lab reports to evaluate side effects and adverse events; generic testing to determine best oncology medications/alternatives; waste prevention can "hold" therapies quicker and more efficiently, avoiding unnecessary refills; and better medication adherence through better/more effective patient communication and education.

134.   "Implementation of the FAQ will result in catastrophic health consequences for an unknown, but guaranteed, percentage of the nation's Medicare and Medicaid cancer patients, approximately 70% of which receive their cancer medications through community oncology and physician dispensing practices." *See* **Exhibit I**, ¶ 25.

135.   Medicare and Medicaid patients are now forced to either pick up each of their cancer medications in-office or transfer their medications to mail order specialty pharmacies. "This will undoubtedly result in reduced adherence for a meaningful percentage of the Medicare and Medicaid patient population base" and "[p]atient adherence to treatment regimen is of particular importance

for cancer patients, and the ramifications for non-adherence can be severe, even life-threatening." **Id.** at ¶ 24.

136.    The FAQ's consequences include:  decreased access to life-sustaining cancer medications; the toxic handling of drugs by untrained individuals; shipping problems; delays; disruption of regimens; and disease progression.  *See* **Exhibit I**, ¶¶ 26-42.

137.    According to Dr. Patel, "[i]f implementation of CMS' FAQ is not enjoined, an unknown, but guaranteed, percentage of the nation's Medicare and Medicaid patients suffering from the debilitating disease of cancer will unquestionably be harmed. Such harms will inevitably include a meaningful increase in the percentage of hospitalizations and even death for this already highly vulnerable patient population." **Id.** at ¶ 40.

138.    Patient Donna McNeil is an example of a near-death experience at the hands of a mail order specialty pharmacy.

139.    Ms. McNeil's oncologist prescribed her the cancer medication, Tagrisso.  The prescription was sent to CVS Specialty Pharmacy and it took roughly forty (40) days to receive any medication from CVS.  Friends and family made countless attempts to follow-up with CVS to obtain the drug.  CVS would say that it was waiting for the insurance carrier.  The insurance carrier informed her that the drug was approved.  CVS consistently gave her the run-around.  *See* Affidavit of Donna McNeil attached hereto as **Exhibit J**, ¶¶ 11-12.

140.    During the time that family and friends struggled to get Ms. McNeil's medication, her condition deteriorated.  She became unable to walk, needed oxygen, and became sicker as each day went by.  She was on the brink of death.  **Id.** at ¶ 12.

141.    On November 2, 2022, Ms. McNeil saw an oncologist at Florida Cancer who also recommended treatment with Tagrisso.  The very next day, a pharmacist from Florida Cancer came

to her home with the medication.  The pharmacist sat down with her husband and educated him on the medication and treatment plan.  **Id.** at ¶¶ 15-16.

142.    Had Ms. McNeil waited for CVS to deliver her medication, she would have died. Florida Cancer and its pharmacy saved her life.  *See* **Exhibit J** ¶ 19.

143.    Ms. McNeil is afraid that if she is forced to use large chain mail order pharmacies, like CVS Pharmacy, to access her cancer medications, her overall cancer treatment, prognosis and health will be negatively impacted.  **Id.** at ¶ 20.

144.    Ms. McNeil's story is not an isolated one.  Practices have reported patients who, after years of non-compliance, were convinced to take their medication reliably. Now, these patients do not have the means or the drive to actively pursue alternative means of obtaining their medication. Without the help of the practices, patient adherence will suffer.  As one practice put it, the FAQ is a death sentence for some of its patients.

145.    Judith Brandt is a 78 year-old patient of Hematology Oncology Associates of Central New York ("HOACNY") who has been diagnosed with immune thrombocytopenic purpura, chronic myelomonocytic leukemia and autoimmune hemolytic anemia.  *See* **Exhibit M** ¶¶ 2-3.  Prior to May 11, 2023, she had been receiving her medication from HOACNY's oncology pharmacy either through the mail or through in-person delivery or by having her daughter pick up her medications.  **Id.** at ¶ 7. Now none of this is possible.  She is worried that she will no longer have timely access to her medications and lose access to the support, education and coordinated care that she receives from HOACNY.  **Id.** at ¶¶ 8-11.  Her fears are heightened by the winter weather and the difficulties/improbabilities she will have travelling twenty-five miles in the snow to Syracuse, New York.  **Id.** at ¶ 6.

146.    M.T., a cancer patient from New York with chronic leukemia, had received her medication via delivery from New York Cancer and Blood Specialists. She is scared to get her

medication from any place other than her doctor's office for fear of delays and negative health consequences. As a result of the FAQ, M.T. now has to take two buses each way to pick up her medication from the practice. She reported that she makes the 4-bus roundtrip during times when she is not feeling well.

147.    In New Mexico, some cancer patients live quite far from New Mexico Oncology Hematology Consultants, are Navajo or Spanish speaking, and have to use a Post Office box that is many miles away because they do not have traditional mailboxes. These facts present major obstacles for navigating a mail order specialty pharmacy that may not speak Navajo and are unable to mail the live-saving medications directly to the patients. *See* **Exhibit E**; *see also* **Exhibit K** ¶ 10 (noting some patients in Idaho having to travel u to five hours to get to the practice).

148.    Similar barriers exist for cancer patients in Oklahoma. Some patients in this state live quite far, do not speak English, have reported extensive delays from mail order pharmacies, and consider "dinnertime" to be at noon and "supper" to be the evening meal which causes confusion with prescriptions ordered to be taken at breakfast and dinner. Out of state chain and centralized mail order pharmacies do not account for, and are likely not even aware of, these regionalized issues. *See* **Exhibit F**.

149.    Patients of Hematology Oncology Associates of Central New York have reported weeks-long delays from mail order pharmacies, receiving drug shipments of medications that the oncologist has long since discontinued, and mail order pharmacies declining prescribed medications. One example – mentioned above – is treating breast cancer with both Ibrance and Letrozole, a standard combined treatment regimen. Patients have reported mail order pharmacies electing to only dispense the Ibrance and decline the Letrozole, which in turn delays treatment and causes unnecessary stress. *See* **Exhibit G**.

150.     Patients of Idaho Urologic Institute, PA ("IUI")[44] have reported that when they used a large, centralized mail order pharmacy, they were delivered drug products that were damaged and ineffective, delaying the start of treatment. In order to be provided a replacement prescription, the mail order pharmacy required the patient to provide it with proof of the damage/tampering, mail the damaged product back to the pharmacy, and then wait for the pharmacy to receive the damaged product and approve the dispensing of a replacement. These mistakes, at no fault of the patient, resulted in a two-week delay to the patient starting cancer treatment. IUI has also been made aware of centralized mail order pharmacies changing prescriptions to a different brand of medication—presumably so that the mail order pharmacy can obtain a higher reimbursement from the patient's insurance company (which also likely results in a higher patient copay)—on prescriptions that IUI's patients have been taking (without issue) for years, and without coordinating these changes with the patient's treating oncologist/urologist at IUI.  *See* **Exhibit K**.

151.     Patients of New York Cancer and Blood Specialists also have expressed concern with mail order specialty pharmacies, particularly the delay in receiving medication, wait-times and lack of knowledge concerning the medication or treatment.  The FAQ affects over 50,000 patients of New York Cancer and Blood Specialists.  *See* **Exhibit L**.

152.     Medicare beneficiaries have the federal statutory "freedom of choice" (42 U.S.C. §1395a) to get their medication from whatever provider they want.  Nothing in the patient choice statute requires a patient to pick up his or her medication in the provider's office, contrary to the mandate of the FAQ.

---

[44] As mentioned above, Plaintiff has constituent member medical practices that are not, per se, pure oncology practices, such as IUI, which are nevertheless involved in cancer care. IUI is broadly aligned with COA's principles, mission and goals as an independent medical practice, in addition to being more specifically aligned with regard to the instant application, since IUI, too, has suffered irreparable harm as a result of the FAQ.

153.    Telling a patient that he or she can no longer receive medication from a reliable and regular source – the practice – is tantamount to elimination or curtailing a patient's right to choose where to receive life-saving medication from.

154.    Plaintiff respectfully requests that this Court temporarily enjoin and restrain CMS from enforcing the FAQ regarding the location requirement of the In-Office Ancillary Services Exception against oncology practices, pending the Court's review of the claims set forth herein.

**COUNT ONE**
**VIOLATION OF THE MEDICARE ACT (42 U.S.C. § 1395hh(a)(2))**
**(Against all Defendants)**

155.    Plaintiff repeats and reiterates the factual allegations set forth above as it set forth at length herein.

156.    42 U.S.C. § 1395hh(a)(2) of the Medicare Act provides, in pertinent part, that there must be public notice and a 60-day comment period for any "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services[.]" *Id.*

157.    The FAQ "establishes or changes a substantive legal standard governing the scope of benefits" and "the eligibility of individuals [and] entities … to furnish or receive services or benefits under [Medicare]" and therefore violates the notice and comment rule-making requirement of the Medicare Act. 42 U.S.C. § 1395hh(a)(2).

158.    CMS never previously established an express prohibition on mailing with respect to Stark and has established a new substantive legal standard or, at minimum, has changed the preexisting legal standard by which most in-office physician dispensing physicians – and in particular, oncologists – abided by over the course of decades, which standard is tied directly to their "eligibility . . . to furnish services . . . under" Medicare.

159.    There were no previous rules or guidance expressly prohibiting mailing; otherwise, there would have been no need to issue the FAQ.

160.    Defendants have violated the Medicare Act and the FAQ should be set aside as being issued without observance of procedure required by statutory law.

## COUNT TWO
## VIOLATION OF THE Administrative Procedure Act (5 U.S.C. § 553(b))
### (Against all Defendants)

161.    Plaintiff repeats and reiterates the factual allegations set forth above as it set forth at length herein.

162.    Section 553(b) of the APA provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register . . ." Failure to comply with this requirement will result in vacatur or nullification of the improperly promulgated rule.

163.    Under the APA, legislative or "substantive" rules require notice and comment, but interpretive rules do not. A legislative rule is one that has legal effect or, alternatively, one that an agency issues with the intent to exercise its delegated legislative power by speaking with the force of law. An amendment to a legislative rule must itself be legislative.

164.    The FAQ attempts to explain the "location requirement" of the In-Office Ancillary Services exception to Stark (42 C.F.R. § 411.355(b)(2)) and in doing so amends the rule for "furnishing a service" (42 C.F.R. § 411.355(b)(5)) by making the office location a mandatory requirement even though subsection (b)(5) is more permissive. *See* 411.355(b)(5) ("A designated health service is 'furnished' for purposes of this paragraph (b) in the location where the service is actually performed upon a patient **or where an item is dispensed to a patient in a manner that is sufficient to meet the applicable Medicare payment and coverage rules**") (emphasis added).

165.    In the FAQ, CMS acknowledges the regulatory text of 411.355(b)(5) but rewrites (b)(5) by repealing the second half of it and making (b)(2)'s location requirement the only requirement. *See*

the FAQ ("The 'location requirement' at 42 C.F.R. §411.355(b)(2) would not be satisfied if a patient receives an item by mail outside the physician's office, as it would not be dispensed to the patient in the office. This is true regardless of whether Medicare coverage and payment rules would permit the supplier to mail the item to the patient and bill the Medicare program for the item.").

166.    In other words, the FAQ requires that designated health services MUST be provided directly to the patient in the physician's office AND in a manner that is sufficient to meet applicable Medicare billing and coverage rules, thereby abrogating the second half of subsection (b)(5).

165.    Additionally, the FAQ constitutes a substantive and material agency "about-face" on the legality of furnishing medications via delivery under the IOAS exception, given that previous agency guidance indicated that doing so was lawful and compliant. *See* FN4, *supra*. This too constitutes the creation or modification of a legislative rule without notice and comment in violation of the APA.

167.    The FAQ has legal effect or, alternatively, was issued with the intent to exercise its delegated legislative power by speaking with the force of law by prohibiting independent community oncology practices, and other independent specialty practices, from mailing oral medication to its patients – even though CMS takes no issue with a patient picking up medication in-person from the practice site.

168.    Thus, the FAQ is legislative, CMS issued it without notice and comment, and it violates the APA and must be vacated.

169.    At minimum, the FAQ amended a legislative rule without notice and comment and, as such, violates the APA and must be vacated.

### COUNT THREE
### VIOLATION OF THE 10th AMENDMENT OF THE U.S. CONSTITUTION
#### (as to all Defendants)

170.    Plaintiff repeats and reiterates the factual allegations set forth above as it set forth at length herein.

171.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X.

172.    The police power of the states under the 10th Amendment extends to the regulation of practitioners of medicine.

173.    A number of States – including without limitation Tennessee, Oklahoma, Illinois, Maryland, Minnesota, Montana, South Carolina, and West Virginia – have promulgated rules regulating the practice of medicine and pharmacy through which physicians may furnish in-office dispensed medications via delivery.

174.    COA has constituent oncology practice members in a number of the foregoing States, including Oklahoma and Tennessee.

175.    One such practice, OCSRI, an Oklahoma-based oncology practice, has submitted an Affidavit herewith in support of this application.

176.    As noted in the OCSRI's submission, prior to the promulgation of the FAQ, the OKBOP generally permitted physician-owned pharmacies to furnish medications to patients via delivery. This is consistent with Oklahoma's preexisting regulatory schema governing the practice of pharmacy and the practice of medicine. *See* OK ST T. 59 § 353.1(12), and (22); Okla. Admin. Code. 510:5-3-5; Okla. Admin. Code 435:10-7-1. Indeed, a plain reading of the afore-cited statutes and regulations more broadly permitted the furnishing of in-office physician-dispensed medications, including cancer medications, to patients via "delivery." *See* OK ST T. 59 § 353.1(12), and (22); Okla. Admin. Code. 510:5-3-5; Okla. Admin. Code 435:10-7-1.

177.    The FAQ directly clashes with the foregoing regulatory schema, to the detriment of Oklahoma oncologists who, prior to it, were, per the foregoing law, able to more optimally care for patients by availing themselves of the ability to furnish cancer medications to patients via delivery.

178.     Notably, prior to the promulgation of the FAQ, the OKBOP did not permit physician-owned pharmacies to ship medications to other practice locations, absent a showing of compelling need (e.g., the patient was homeless and, as such, had no home to which the pharmacy could mail the cancer medications). After the promulgation of the FAQ, however, the OKBOP, being apprised of the FAQ and its federal implications for physicians seeking to furnish medications by delivery, modified the standards by which it would permit physician-owned pharmacies to mail medications to other practice locations, as the OKBOP understood that patients' only alternative was to switch to the problematic, often-PBM-owned mail order specialty pharmacies.

179.     In short, the FAQ directly and concretely clashes with Oklahoma's preexisting regulatory schema governing the furnishing of physician-dispensed medications (or physician-owned pharmacy dispensed medications) to patients via delivery to the detriment of Oklahoma's physicians and patients alike.

180.     The FAQ violates the 10th Amendment because the prohibition on mailing drugs to patients pursuant to the In-Office Ancillary Services exception to Stark interferes with the police powers of States whose Boards of Pharmacy and Medical Examiners regulations permit mailing of in-office, physician-dispensed medications.

181.     This interference harms the State and, by extension, the physicians and oncologists – including those oncologists and oncology practices who are members of COA.

182.     As such, Defendants have violated the 10th Amendment and the FAQ should be set aside as unconstitutional.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby demands judgment in its favor and against Defendants as to each and every cause of action and the following relief:

a) Preliminary injunction against Defendants enjoining them from enforcing the FAQ regarding the location requirement of the In-Office Ancillary Services Exception against oncology practices;

b) An Order setting aside the FAQ as unlawful because it did not undergo formal notice and comment procedures and requiring Defendants to remove the FAQ from its website;

c) An Order setting aside the FAQ as unconstitutional;

d) Judgment against Defendants that they violated the Medicare Act;

e) Judgment against Defendants that they violated the APA;

f) Judgment against Defendants that they violated the 10th Amendment;

g) Award Plaintiff costs, expenses, and attorneys' fees (pursuant to any applicable statutes, Rules or provisions, including the Equal Access to Justice Act, 28 U.S.C. § 2412); and

h) Such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**FRIER LEVITT, LLC**
*Attorneys for Plaintiff*

Dated: July 25, 2023

*/s/Jonathan E. Levitt*

Jonathan E. Levitt, Esq.
Jason N. Silberberg, Esq. (*Pro Hac Vice* Application to be Filed)
Matthew J. Modafferi, Esq. (*Pro Hac Vice* Application to be Filed)
jlevitt@frierlevitt.com
jsilberberg@frierlevitt.com
mmodafferi@frierlevitt.com

84 Bloomfield Avenue
Pine Brook, NJ 07058
Tel:    (973) 618-1660
Fax:    (973) 618-0650

101 Greenwich Street, Suite 8B
New York, NY 10006

## **VERIFICATION**

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury under the laws of the United

States of America that the foregoing Verified Complaint is true and correct to the best of my present

knowledge and belief.

Dated:  July 25, 2023

_____

Ted Okon, Executive Director
Community Oncology Alliance,
On behalf of Community
Oncology Alliance